IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DEBRA SIMPKINS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 05-cv-0882-MJR |
| ) | |
| POLICE DEPARTMENT OF THE CITY OF ) | |
| EAST ST. LOUIS, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM & ORDER

**REAGAN, District Judge:**

### I.   Introduction

On December 16, 2005, Plaintiff, Debra Simpkins, *pro se*, filed a complaint in this Court against the Police Department of the City of East St. Louis ("the Department") alleging sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1988 and the common law of the State of Illinois.[1]  Jury trial is set to commence on August 13, 2007, before the undersigned District Judge, with a final pretrial conference on July 20, 2007.

Now before the Court is the Department's summary judgment motion (Doc. 61), which is fully briefed and ready for disposition.  Analysis begins with an overview of the key facts and recitation of the legal standard governing summary judgment motions in this Court.

---

[1] On July 10, 2006, Simpkins, represented by counsel, filed an amended complaint in which she abandoned claims against Carl E. Officer, James Mister, Aubrey Keller and Caroliss Childress.  On November 3, 2006, the Court granted Simpkins' motion to dismiss voluntarily City of East St. Louis as a Defendant herein.

1

## II.   Factual Background

On June 3, 2003, the Department hired Simpkins as a patrol officer. When Simpkins began with the Department, Ronald Matthews was the chief, and her immediate supervisor was Lieutenant Cole. Doc. 61, Exhibit FF, Simpkins Deposition 18:13-18. Simpkins became "romantically involved" with Cole in June, 2003. *Id.*, 32:6-9. In May, 2005, James Mister was appointed Police Chief and affirmed interim Police Chief Linzie Stewart's appointment of Lieutenant Caroliss Childress to be in charge of the Patrol Division. Doc. 61, Exhibit A, Mister Affidavit ¶¶ 2, 3. Mister also assigned Cole to be in charge of Support Services Division, and, thus, Cole was no longer in the direct chain of command above Simpkins. *Id.* at ¶¶ 3, 4.

According to Mister, there is a general rule that Patrol Officers may not go on the second floor of the Police Department without permission. Mister Aff. ¶ 5. Simpkins disputes this, asserting that there is nothing in the East St. Louis Policy and Procedures that states that a police officer, when off-duty and in uniform, must go through the chain of command to go anywhere in the Department. Doc. 61, Simpkins' Subject Report, p. 2. Childress told Simpkins to conduct her personal business outside the Department and not to go to the second floor or to Cole's office while in uniform or off-duty without going through the proper chain of command. *Id.*

On June 9, 2005, Simpkins was on the second floor of the Department without authorization from her direct supervisor, Sgt. Simpson Sylvester, or anyone else in the direct chain of command. Doc. 61, Exhibit C, Sylvester Affidavit ¶ 8. Sylvester agreed with Childress's decision to send Simpkins home for insubordination on June 9, 2005. *Id.* Simpkins made her first oral claim of sexual harassment against Childress to Chief Mister on June 15, 2005. Simpkins Dep. 88:3-14. Chief Mister told her to put her complaint into writing, which she did. *Id.* 88:7-11.

Simpkins reported not only the incident which allegedly occurred on June 9, 2005, but also other alleged incidents of sexual harassment by Lt. Childress. In her deposition she stated that she filed a formal complaint with the Equal Employment Opportunity Commission ("EEOC") on July 5, 2005.[2] *Id*. 107:11-17. Simpkins' reports of sexual harassment are the following.

Simpkins testified that the first incident of sexual harassment by Childress occurred in January, 2005. Exhibit D, Simpkins Dep. 32:22-25. Simpkins stated that Childress stopped her in a stairwell, looked her up and down, licking her lips in a sexual manner. *Id*. 33:4-9. Simpkins described the sexual nature of "licking of the lips" as "[s]ticking her tongue out, flicking it backwards and forwards." *Id*. 34: 33:2-7. During that incident, Childress did not say anything of a sexual nature, did not touch Simpkins and did not suggest a sexual relationship. *Id.* 34:10-16. Simpkins did not tell Childress that she thought she was sexually harassing her, did not tell Childress to stop what she found to be sexual harassment and did not report the incident to her supervisor, although she told two other officers and a sergeant. *Id*. 35:14-39:9.

In April, 2005, Simpkins was dispatched to a call at a house where there had possibly been a shooting. Exhibit E-1, Simpkins Dep. 35:11-14. Childress called her back and told her to stand with her and Officer Miles, another female, saying, "Let the guys handle that." *Id*. 35:16-19. Simpkins testified that no sexual harassment occurred, but she objected to "the gender thing" and saw no reason for not doing her job at that time. *Id*. 37:1-5. She said nothing to Childress and did not feel she was being sexually harassed at that time. *Id*. 37:6-11.

The next incident of sexual harassment alleged by Simpkins occurred in June, 2005.

---

[2]According to Simpkins' amended complaint, she filed two charges with the EEOC: sexual discrimination on July 12, 2005, and retaliation in relation to the complain of sexual discrimination on May 2, 2006.

3

Simpkins Dep., Exhibit F-1, 41:7-9. Simpkins testified that Childress questioned her about taking unscheduled vacation days. *Id.* 41:11-14. Childress put her hand on Simpkins shoulder, told her that she had taken a lot of unscheduled vacation and asked her who had given it to her. *Id.* 41:14-18. Childress's hand was on her shoulder for approximately four seconds, and Childress was smiling, licking her lips, flicking her tongue and looking her up and down. *Id.* 41:19-25, 42:1-6, 46:12-13. The smiling and flicking her tongue back and forth were sexual. *Id.* 43:1-6. Childress said nothing of a sexual nature to Simpkins. *Id.* 43:5-7. Simpkins told Childress that she was uncomfortable with being alone with her. *Id.* 44:10-12. Childress left the room, and there was no further interaction. *Id.* 44:19-25. The incident lasted approximately five minutes. *Id.* 45:8-9. Nothing else caused Simpson concern at this incident, and Childress did not sexually proposition Simpkins. *Id.* 46:24-25, 47:1-4.

On June 9, 2005, Childress had Simpkins come to her office with Gilda Johnson and Sylvester Simpson. Doc. 61, Exhibit G-1, Simpkins Dep. 47:8-10. The meeting was in reference to Simpkins' being on the second floor without permission. *Id.* 47:13-15. When Johnson and Sylvester were looking at each other, Childress began "twitching in her seat trying to get [Simpkins'] attention." *Id.* 47:22-24. When Simpkins looked at her, Childress again looked her up and down, flicking her tongue. *Id.* 47:24-25. Childress did not speak out loud but formed the words, "I'm going to get you. I'm going to show you what personal is." *Id.* 48:1-5.

There was no other sexual harassment by Childress after June 9, 2005. *Id.* 63:2-5. Childress did not sexually proposition Simpkins or touch her beyond the four seconds that she had her hand on her shoulder. *Id.* 63:6-15. Simpkins had heard rumors from other officers "cracking jokes," telling her that Childress "wanted some ass." *Id.* 63:22-24.

4

Simpkins did not return to work after the incident on June 9, 2005, until July 14, 2005. Doc. 61, Exhibit FF, Simpkins' Deposition 193: 19-20. On July 14, 2005, she met with Chief Mister, Assistant Chief Aubrey Keller, her Union representative and Detective Roy Mickens. *Id*. 195:4-7. She was placed on administrative leave while her claims of sexual harassment against Childress were investigated. *Id*. 195: 19-22. The Internal Affairs Department interviewed Simpkins on July 22, 2005, regarding her allegations against Childress; however, Simpkins refused to give a recorded statement at her interview, stating that she would stand on her written documents. *Id*. 206:3-7, 13-16; 208:7-12, 19-21. Simpkins' union representative was present with her. *Id*. 205:21-23.

According to Simpkins, when she refused to give a recorded statement, Assistant Chief Keller relieved her of her duties and terminated her employment. *Id*. 210:10-25, 211:1-2. Defendant asserts that, to the contrary, under the union contract, Simpkins could not have been terminated on July 22, 2005, but, rather, was placed on administrative leave.[3] Doc. 61, Exhibit Y, John Gilbert Affidavit. The Department states that Simpkins knew or could have easily ascertained through her union representative, who was present at the meeting, that she could not be terminated from her employment on July 22, 2005. Simpkins testified that approximately July 29, 2005, she spoke with a union representative who told her that she could not be verbally terminated but would have to go before the Police and Fire Board. *Id*. 256:14-22; 257:3-7.

Assistant Chief Keller told Simpkins to report to Chief Mister on July 25, 2005, but

---

[3]"Pursuant to the [Collective Bargaining] Agreement, members of the bargaining unit cannot be terminated without just cause nor without proceedings before the Board of Police an Fire commissioners of the City of East St. Louis or the grievance procedure provided for pursuant to the Agreement. Plaintiff is a member of the bargaining unit." Doc. 61, Exhibit Y, Gilbert Affidavit ¶ 4.

Simpkins called on that morning to advise them that she would not come in because she was ill. *Id*. 252:4-20. Simpkins did not report to work that week, and, as a result, an officer was dispatched to her house on Friday, April 29, 2005, who told her to report to Chief Mister's office on August 1, 2005. Doc. 61, Exhibit Z. In a memorandum dated August 1, 2005, Chief Mister instructed Simpkins that, effective August 8, 2005, she was placed on administrative leave assignment pending disposition of charges against her. Doc. 61, Exhibit AA.[4] The charges listed by Mister were 1) her failure to obey Childress's order regarding obtaining permission before going to the second floor of the Department; 2) refusal to cooperate with an investigation into allegations of sexual harassment in spite of being admonished to do so; and 3) failure to comply with Chief Mister's directive to appear at his office on July 25, 2005. *Id*.

A review board panel convened on August 16, 2005, to hear her sexual harassment complaint. *Id.* 229:17-21. Simpkins brought no witnesses, presented no evidence and made no statement, again preferring to stand on her written documents alone. *Id*. 229:22-25, 230:1-15. The review board concluded that, as a result of the evidence presented and the lack of cooperation on Simpkins' part, her complaint was without any merit and no further action was merited. *Id*. 243:13-17; Doc. 61 Exhibit CC, Mister letter.

### III. <u>Applicable Legal Standards</u>

Summary judgment is proper if the pleadings, depositions, interrogatory answers, admissions, and affidavits reveal that there is no genuine issue as to any material fact *and* that the moving party is entitled to judgment as a matter of law. ***Vukadinovich v. Board of School Trustees***

---

[4]The record is muddied at this point because it appears that Simpkins was placed on administrative leave pending disposition of the charges against her as well as pending an investigation of her charges against Childress.

*of North Newton School Corp.*, **278 F.3d 693, 698 (7th Cir. 2002).**

The mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion. *Anderson v. Liberty Lobby*, **477 U.S. 242, 247 (1986);** *Salvadori v. Franklin School District,* **293 F.3d 989, 996 (7th Cir. 2002).** Rather, to successfully oppose summary judgment, the nonmovant must present definite, competent evidence in rebuttal. *Salvadori,* **293 F.3d at 996 (***citing Vukadinovich***, 278 F.3d at 699).**

### IV. <u>Analysis</u>

**A.    Claim of Retaliation**

Before engaging in further analysis, the Court notes that several of the incidents of which Simpkins complains, *e. g.,* being reprimanded for being on the second floor, occurred prior to July 12, 2005, the date that she filed her charge of sexual discrimination with the EEOC. In her amended complaint, Simpkins specifically alleges, as follows:

> a.    On or about July 12, 2005, Ms. Simpkin [sic] filed a formal charge of sexual discrimination with the Equal Opportunity Commission . . .;
> b.    On or about May 2, 2006, Ms. Simpkin [sic] filed a formal charge of retaliation in relation to the complaint of sexual discrimination with the Equal Employment Opportunity Commission. . . ."

Plaintiff's Amended Complaint, ¶ 7(a), (b). Actions taken before Simpkins filed her formal charge of sexual discrimination with the EEOC, that is, prior to July 12, 2005, cannot have been in retaliation for the filing of this charge.

Under Title VII, unlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination. *Rogers v. City of Chicago*, **320 F.3d 748, 753 (7th Cir. 2003) (***citing Fine v. Ryan Int'l Airlines***, 305 F.3d 746, 751 (7th Cir. 2002) and 42 U.S.C. § 2000e-3)**. A Title VII plaintiff may establish a prima facie

7

case of retaliation both by direct evidence and by indirect evidence.

There are two methods of presenting <u>direct</u> evidence. First, the plaintiff can present "evidence that, if believed by the trier of fact, would prove the fact in question 'without reliance on inference or presumption.'" ***Rogers*, 320 F.3d at 753 (*quoting Walker v. Clickman*, 241 F.3d 884, 888 (7th Cir. 2001), and *citing Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999)).**

Direct evidence "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." ***Rogers*, 320 F.3d at 753 (*citing Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000)).** Such admissions "are rarely encountered." ***Rogers,* 320 F.3d at 753 (*citing Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 576 (7th Cir. 2001))**. The second method of direct proof involves circumstantial evidence, *i.e.*, evidence that allows a jury to *infer* intentional discrimination by the decision maker. ***Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 396 (7th Cir. 1997)**.

The Title VII plaintiff can also choose the <u>indirect</u> method of proof. Under this method, the plaintiff must show that "a similarly situated employee who had not engaged in statutorily protected activity was treated more favorably." ***Tomanovich v. City of Indianapolis*, 457 F.3d 656, 666 (7th Cir. 2006) (*citing Moser v. Ind. Dept. of Corr*., 406 F.3d 895, 903 (7th Cir. 2005)**.

If the plaintiff makes this showing *and* the defendant presents no evidence in response, then the plaintiff is entitled to summary judgment. ***Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002).** On the other hand, if the defendant presents un-rebutted evidence of a noninvidious reason for the adverse action, then the *defendant* is entitled to summary judgment. ***Id.*** If neither of these occurs, the case proceeds to trial. ***Id.***

In *Stone*, the Seventh Circuit clarified that this new formulation eliminated the requirement of earlier decisions which required the plaintiff to prove a "causal link" between his protected activity and the adverse employment action. ***Rogers*, 320 F.3d at 755 (*citing Stone*, 281 F.3d at 642-44.**

Simpkins has presented no direct evidence of retaliation – either via an admission of a decision maker at the Department or circumstantial evidence supporting an inference of intentional discrimination by the Department. Thus, the Court focuses on the second method of proof, the indirect approach, an "adaptation of *McDonnell Douglas* to the retaliation context." ***Haywood v. Lucent Technologies, Inc., 323 F.3d 524, 531 (7th Cir. 2003) (*citing Stone*, 281 F.3d at 644)**.

Simpkins must first show that ". . . (1) she engaged in statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Haywood*, **323 F.3d at 531 (*citing Stone*, 281 F.3d at 644)**.

Simpkins falls short of demonstrating the elements of a prima facie case for retaliation. While Simpkins does meet the first element of a prima facie case for retaliation in that she engaged in a statutorily protected activity, *i. e.*, reporting her claim of sexual harassment, she has not established the other three elements: (2) that she performed her job according to her employer's legitimate expectations, (3) that despite her satisfactory performance, she suffered an adverse employment action, and (4) that she was treated less favorably than similarly situated employees. Simpkins must show that she performed her job according to her employer's legitimate expectations. However, Simpkins offers no evidence that she did, in fact, meet the

9

Department's expectations. To the contrary, the evidence is that, on June 9, 2005, Simpkins went to the second floor of the Department in violation of a direct order by Childress, who was in charge of the Patrol Division and, thus, above her in the chain of command. Sylvester, Simpkins' direct supervisor, agreed with Childress's decision to send Simpkins home for insubordination. She did not return to work for more than a month after this incident, until July 14, 2005. Simpkins refused to cooperate with an investigation into her allegations against Childress by giving a recorded statement in spite of being ordered by Chief Mister to do so, another insubordinate act. As a result, she was sent home on July 22, 2005, with instructions to appear at Chief Mister's office on July 25, 2005. She failed to comply with that directive. These acts of insubordination are direct evidence that Simpkins was *not* meeting her employer's expectations.

Even assuming that Simpkins did meet her employer's legitimate expectations, she cannot prove that she suffered an adverse employment action. The parties dispute whether Simpkins was fired on July 22, 2005, or placed on administrative leave. In addition to what the parties have argued, the Court notes that it would be at least unusual to fire a person on a Friday (July 22, 2005) and tell that person to report to her supervisor's office on Monday (July 25, 2005). In either case, Simpkins disobeyed the order to report to Chief Mister's office on July 25, 2005, and did not advise the Department of her status from July 23 through July 31, 2005. This is corroborated by Sgt. Hill's July 29, 2005 memorandum to Chief Mister, wherein Hill advised Mister that Assistant Chief Keller had dispatched him to Simpkins' residence to inform her that she should report to Mister's office on August 1, 2005, or "continual [sic] to be off no report." Doc. 61, Exhibit Z.

Simpkins was "reinstated" on or about August 1, 2005. Amended Complaint ¶ 16. She was, however, placed on administrative leave either, according to Simpkins, so that her

10

allegations of harassment could be investigated or, according to the Department, for insubordination. Simpkins was returned to full duty with the Department on or about August 25, 2005. Amended Complaint ¶ 17. Nothing in Simpkins' complaint or in her response to the Department's motion for summary judgment suffices to prove an adverse employment action.

Adverse employment actions are typically economic injuries such as dismissal, demotion, suspension, failure to promote, or decreased pay. ***Markel v. Bd. of Regents of the University of Wisconsin System*, 276 F.3d 906, 911 (7th Cir. 2002) (*citing Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761-62 (1998))**. In the case at bar, Simpkins claims past and future economic loss. However, the only basis she sets forth is that she was physically unable to return to work on a constant basis because of stress and anxiety caused by being sexually harassed by Childress. She puts forth no evidence that her economic loss was the result of retaliation by the Department.

As documented in the Department's summary judgment motion, Simpkins' pay was only docked for sick leave days taken in excess of those earned under the union contract and for those days when she did not report to work without advising the Department of her status.

Simpkins purportedly lost wages between June 9, 2005 and July 14, 2005, when she took off work without a doctor's excuse. Ethel Bush, Administrative Assistant to the Chief of Police, provided a synopsis of Simpkins' sick day history. Doc. 61, Exhibit EE, Bush Affidavit. Under the union contract, a police officer earns one day of sick leave for every month of work. *Id*. In 2003, Simpkins earned seven sick days and used none, so that seven days were carried over to 2004. *Id*. In 2004, she earned twelve sick days and used eight, so that eleven days were carried over into 2005. *Id*. In the year at issue, 2005, Simpkins earned twelve sick days but used fifty-three, so

11

that her pay was docked for the thirty days that she stayed home sick for which she had not earned sick day pay.[5] *Id*.

Simpkins was on a previously scheduled vacation from August 1, 2005 through August 7, 2005. Simpkins Deposition 148:14-18. Her administrative leave began on August 8, 2005. *Id*. 148:19-21. She was advised on August 23, 2007, that there was no merit to her sexual harassment complaint. *Id*. 150:25,151:1-2. She returned to full duty on August 25, 2005.

Simpkins presents no definite, competent evidence in rebuttal as she must to defeat a motion for summary judgment. ***Salvadori*, 293 F.3d at 996 (*citing Vukadinovich*, 278 F.3d at 699)**. She offers no evidence that she provided a doctor's excuse for her sick days, that she sought the additional sixty days of sick time available under the Collective Bargaining Agreement or that she filed a grievance with the union for the days that her pay was docked.

Finally, Simpkins offers no evidence that she was treated less favorably than similarly situated employees. The record is completely devoid of evidence satisfying this element of the prima facie case.

Accordingly, the Department is entitled to summary judgment on Simpkins' retaliation claim, as she has not made a prima facie case of retaliation. Simpkins has not proven that she performed her job according to her employer's legitimate expectations, that despite her

---

[5]The Collective Bargaining Agreement provides that an officer who has an illness or injury that would require more sick days than the officer has available may request an additional sixty days of sick time. In order to be eligible for additional sick time, the officer's illness or injury must be certified by a licensed physician. The employer may only refuse such a request for just cause. Doc. 61, Exhibit Y, Collective Bargaining Agreement, Article 20. Simpkins has provided no evidence that she made such a request or that she grieved the docking of her pay in June and July, 2005. She did, however, file a grievance pursuant to the Agreement for docking of her pay for periods in September, 2006. *Id*. Gilbert Affidavit. Her grievance was denied. *Id*.

satisfactory job performance, she suffered an adverse employment action and that she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.

**B.     Claim of Sexual Harassment**

For a plaintiff to prevail on a hostile work environment claim under Title VII, she must show the following: ". . . (1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on her sex; (3) the sexual harassment had the effect of unreasonably interfering with her work performance in creating an intimidating, hostile, or offensive working environment that seriously affected her psychological well-being; and (4) a basis for employer liability exists." ***Durkin v. City of Chicago,* 341 F.3d 606, 611 (7th Cir. 2003) (*citing Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354-55 (7th Cir. 2002)).**

A workplace is objectively offensive when "a reasonable person would find [it] hostile or abusive." ***Rogers,* 320 F.3d at 752 (*citing Cerros v. Steel Technologies, Inc.*, 228 F.3d 1040, 1045 (7th Cir. 2002)).** Proving that a workplace is objectively offensive is difficult, and drawing the line is not always easy. ***Id.*** "Not every unpleasant workplace is a hostile environment. The occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers would be neither pervasive nor offensive enough to be actionable. The workplace that is actionable is the one that is hellish." ***Id.* (*quoting Baskerville v. Culligan Int'l Co.,* 50 F.3d 428 (7th Cir. 1994)).**

When determining whether conduct is sufficiently severe or pervasive to be actionable, a court is to look at all the circumstances: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening of humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." ***Peters v. Renaissance***

*Hotel Operating Co.,* **307 F.3d 535, 552 (7th Cir. 2002).**

Based on the record in the case at bar, a reasonable jury could not conclude that the events were sufficiently severe or pervasive to constitute a hostile work environment that was objectively offensive. Accepting as true all of Simpkins' allegations against Childress, the sexual harassment consisted of three instances over a five or six months' period where Childress smiled at her and looked at her in a sexual manner, "looking her up and down," and licked her lips, flicking her tongue backwards and forwards. In one instance, Childress placed her hand on Simpkins shoulder for approximately four seconds and, in another instance, formed the words, "I'm going to get you. I'm going to show you what personal is." In Simpkins' deposition, she stated that Childress did not sexually proposition her or suggest a sexual relationship, did not touch her other than the four-second touch on the shoulder and did not remain in the room when Simpkins told her that she was uncomfortable being alone with her. While the conduct alleged was inappropriate, and any employee in Simpkins' position might have experienced discomfort and distress as a result of her superior's advances, the conduct was not objectively offensive. *See Saxton v. American Telephone & Telegraph Co.,* **10 F.3d 526 (7th Cir. 1993)**. *See also, Rogers,* **320 F.3d at 753 (finding that a supervisor asking an employee whether she had a boyfriend or needed one, commenting about her breasts and telling her that he wanted to watch her walk across the room and put a document in a box, were not enough to constitute an objectively offensive environment);** *Weiss v. Coca-Cola Bottling Co.*, **990 F.2d 333, 337 (7th Cir. 1993) (finding that a male co-worker's conduct consisting of several incidents of unwanted touching, attempts to kiss, placing "I love you" signs in her work area, and asking a female employee out on dates did not create a hostile work environment)**.

Finally, there is no basis for employer liability. In considering whether an employer is liable in a hostile environment sexual harassment case, ". . . the central question is whether the harasser is the victim's supervisor or merely a co-worker." ***Durkin,*** **341 F.3d at 611 (***citing*** *Faragher v. City of Boca Raton***, 524 U.S. 775, 805-06 (1998))**. However, even though Childress qualifies as Simpkins' supervisor, the Department cannot be held liable because Childress took no tangible employment action against Simpkins. ***See id***.

"A tangible employment action 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" ***Hardy v. University of Illinois at Chicago,* 328 F.3d 361, 364 (7th Cir. 2003) (***quoting Burlington Indus., Inc. v. Ellerth***, 524 U.S. 742, 761 (1998))**. Childress's only direct employment action against Simpkins was sending her home on June 9, 2005, for being on the second floor of the Department in violation of a direct order. Simpkins was sent home after meeting with Childress, Simpkins' immediate supervisor, Sylvester, and her union representative, Johnson. This action does not rise to the standard of a "tangible employment action" against Simpkins.

Since Childress took no tangible employment action against Simpkins, Simpkins must show that the Department was negligent in discovering and remedying the harassment. ***See Durkin*, 341 F.3d at 612**. "An employer may defend against harassment charges by showing it exercised reasonable care to discover and rectify promptly any sexually harassing behavior." ***Id.*** A review of the record reveals that the Department has a proper system for the making and forwarding of complaints about sexual harassment and that the Department utilized its system. On June 15, 2005, Simpkins orally reported to Chief Mister that she was being sexually harassed by

Childress, and he told her to put her complaint in writing. Simpkins did not return to work until July 14, 2005, at which time she met with Chief Mister, Assistant Chief Keller, her union representative and another detective. The Collective Bargaining Agreement provides for her to be placed on administrative leave while her claims were investigated. Doc. 61, Exh. Y Agreement, Article 7. The Internal Affairs Department conducted an investigation, interviewing her on July 22, 2005. A review board panel convened on August 16, 2005, to hear her complaint and concluded that her complaint was without merit and warranted no further action. Thus, the Department was not negligent in exercising reasonable care to discover and rectify promptly any sexually harassing behavior. Therefore, summary judgment is warranted in the Department's favor as to the claim of sexual harassment.

## V. Conclusion

There is no genuine issue as to any material fact, and the Police Department of the City of East St. Louis is entitled to judgment as a matter of law. Accordingly, the Court **GRANTS** the Police Department of the City of East St. Louis's motion for summary judgment (Doc. 61). The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant Police Department of the City of East St. Louis and against Plaintiff Debra Simpkins. This case is now **CLOSED**.

**IT IS SO ORDERED.**

**DATED this 24th day of July, 2007**

                                                  s/Michael J. Reagan
                                                  **MICHAEL J. REAGAN**
                                                  **United States District Judge**